McBRIDE, Judge.
On the evening of September 26, 1955, a special meeting of the membership of Carpenters Union, Local 1846, was held at the Union Hall located at 315 South Broad Street, New Orleans. The atmosphere prevailing was tense, for the record shows that the business agent of Local 1846 had been advised by telephone that trouble could be expected at the meeting which prompted the placing of a police detail of two officers outside the hall. Members of other locals, besides Local 1846, were present, as the matters discussed pertained to the Carpenters’ Council and involved not only the Carpenters’ Local but several other locals as well.
During the course of the meeting defendant, Hill, struck Landry, the plaintiff, a blow in the face with his right hand which rendered Landry unconscious.
*309 By this suit Landry seeks to recover from Hill more than $25,000 as damages; the petition alleges that the assault was violent and unprovoked. Hill denies this and sets up in his answer that while at the meeting, he was approached by Landry and was informed that Landry’s presence there was for the purpose of acting as bodyguard and to see to it that Hill kept his mouth shut. Hill further averred that on previous occasions Landry had made threats against him, and during the meeting the plaintiff placed his hand in his pocket in such a manner so as to cause Hill to feel that the plaintiff was reaching for a weapon. The answer further alleges that as a result of abusive language, which the plaintiff used on this and previous occasions, and as a result of the menacing gesture on the part of the plaintiff, Hill struck the plaintiff and that his act of striking was the result of provocation by the plaintiff and the action of plaintiff in reaching to his pocket causing the defendant to feel he was armed.
Defendant assumed the position of plaintiff in reconvention praying for a judgment against Landry for $750 for the mental anguish caused him by Landry having placed him in fear of what appeared to be an imminent attack.
On these pleadings and contentions the matter was tried by a jury which returned a verdict dismissing both the main and the reconventional demands. A poll showed the jury voted 10 to 2.
In accordance with the verdict a judgment was rendered dismissing both demands and plaintiff only has taken this appeal.
Shortly before the meeting took place, Landry was in a barroom located approximately one block from the meeting place in company with Schexnayder and Rybiski drinking beer. Rybiski did not appear as a witness, but Schexnayder took the stand on behalf of defendant, and he states that Landry used “dirty names” in speaking of Hill, and further he said that Hill was not fit to hold office in the union. Schexnayder also attributed to Landry the remark that Landry was going to the hall and “stop some of that stuff.” Landry then left and Schex-nayder says the next thing he knew the fight had happened at the hall.
The record bears out that Landry was of a turbulent disposition when it came to union affairs. Breaud states that at an election of officers Landry stated that “Anybody on the Hill and Gravois ticket is a bunch of * * to which Breaud answered “I ain’t one of those guys,” whereupon Landry “swung on me.” Baye, appearing for defendant, stated that one evening previous to the night on which the meeting had been held, he was present in a store with Eilers and that Landry appeared in the store and the three had a conversation regarding Hill. Baye testified that Landry stated:
“ * * * Hill was a no-good, so and so, and he was causing a lot of trouble in the local union, and agitating things, and the best thing we could do was to get his card, take his card away from him, and run him out of town, and I said, ‘Landry, if you have any grievance with Mr. Hill, you ought to take it up with Mr. Hill.’ * * * ”
Hill states that he learned of these reports:
“ * * * it was told to me by Mr. Schexnayder, and it was likewise told to me by Mr. Baye that they were going to endeavor to take my card away from me if I didn’t keep my damned mouth shut, and if it was the last act of their lives, they were going to take my card, and I told them they were going to get an opportunity to take my card.”
Hill also states that he received reports that if “they weren’t able to take my card away, that they were going to run me out of town.”
*310 Luttrell says he saw Hill punch Landry and that the former said: “I did my part.” Zinglersen states that he saw “Brother Hill drawing back to uncork one, to hit Landry.” Several other witnesses saw Landry falling as a result of Hill’s punch and others saw Landry lying on the floor in a pool of blood.
Hill reached the Union Hall first and was seated when Landry entered and proceeded up the aisle. Although sufficient seats for everyone were available and the rules of order used at the meetings require that each member should be seated, Landry chose to stand leaning against the wall a short distance removed from where Hill had taken his seat. Laborde states there was no argument before the blow was struck while Luttrell and Zinglersen heard loud voices; Marx said he heard some mumbling.
Covello was seated about four feet from Hill and he stated there was an argument between the two and he heard Landry say to Hill: “I am here as a bodyguard to keep your mouth closed.” When this remark passed, Covello says Hill arose from his seat and went up to Landry and told him “he wasn’t playing second fiddle to nobody, and to defend himself” whereupon Landry dropped his right hand to his pocket “and kind of raised up his left hand about waist high, and that’s when he was hit on the left side of the face, in the jaw.” Marx stated that Hill, before the altercation, had been seated with a notebook in his hand into which he made entries from time to time, and that after he heard the mumbling Hill got up and told Landry to defend himself and that Landry’s right hand went to his pocket and then Hill punched Landry.
Landry states that without cause or reason Hill arose, walked toward him and said “Are you a bodyguard here?” to which question Landry states he answered “Hell, no” and then turned toward the front of the hall and that all he remembers is “I was struck.”
Hill maintains he struck Landry in self defense. He declares that he met Landry on the stairs and he appeared as though he had been drinking and was calling another member of the union a “no good — .” Defendant says he admonished Landry to “quit passing remarks that had got back to me, and he had passed on several jobs, and I was ‘crooked’ and ‘no good.’ ” Hill insists he thereupon walked away from Landry, went into the hall, and found a seat, and about some ten minutes later Landry came into the building and “deliberately stayed right there” near him. He claims Landry informed him that he was a bodyguard “and he was there particularly to take care of me.” Hill states that after that remark he arose and went to Landry asking him who he was bodyguard for and that Landry answered: “I am pretty well able to take care of you.” It was at this juncture, according to Hill, Landry put his left foot forward and dropped his right hand to his pocket and fearing that he would be subjected to injury from a weapon that Landry might have carried, he struck Landry the one blow in the face.
Landry denied that he ever cursed or made abusive remarks regarding Hill or that he did anything at the meeting which could be construed as provocative or that he carried or reached for a weapon.
The welter of testimony in the case is indeed confusing, but the weight of it is sufficient to lead us to believe that there had been a pre-existing bad feeling between the two men which reached its climax at the union meeting on the night in question. It is hard for us to believe that Hill, without any cause at all, would have arisen from his seat, walked over to where Landry stood, and then without further ado struck Landry in the face and knocked him unconscious.
The jury heard the testimony of the plaintiff and the defendant and all of their witnesses and observed their demeanor while testifying, and if we were to- re *311 verse the judgment it would entail our completely ignoring all testimony adduced on behalf of defendant and substituting in its place and accepting as true what Landry and his set of witnesses had to say. We do not believe that we should do this as there appears no manifest error whatever in the judgment. The jury having resolved all questions of veracity and factual situations adversely to plaintiff, we can only allow the judgment to stand.
The findings of juries on questions •of fact are accorded great weight and in a case where there is conflicting evidence .and a conclusion is to depend on the revolving of questions of fact, the burden is .on the appellant to show the reviewing •court, as a basis for reversal, that the judgment appealed from is manifestly erroneous. This principle is so well settled that it does mot require the citation of any authority in support thereof.
The jurisprudence is well settled -to the effect that there is no right of recovery for an assault'by one who is himself ■in the wrong, and in this case the evidence -the jury believe preponderates to the effect dhat the plaintiff was bellicose and looked for trouble, and this unquestionably led the defendant to believe that when Landry put his foot forward and reached into his pocket .that he was endeavoring to draw therefrom .a weapon with which to assault Hill. We believe Hill feared danger of an assault .and that this caused the retaliatory blow to be struck. Several of the witnesses from both sides say that one or both of Landry’s hands was still in a pocket or pockets as he lay on the floor unconscious.
Therefore, the judgment appealed from is .affirmed.
Affirmed.